FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

99 JUN -4 PM 4: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| INTERGRAPH CORPORATION, | ] | |
| Plaintiff, | ] | |
| vs. | ] | CV 97-N-3023-NE |
| INTEL CORPORATION, | ] | |
| Defendant. | ] | |

ENTERED
JUN 0 4 1999

### Memorandum of Opinion

The court has for consideration Intel's Motion for Summary Judgment on Its License Defense, filed on June 17, 1998, and Intergraph's Cross-Motion for Summary Adjudication of Issues, filed on September 15, 1998. In essence, the parties have asked the court to determine as a matter of law whether Intel possesses a license to the patents that are the subject of Intergraph's patent infringement claims. A hearing on the motions was held on Saturday, March 20, 1999, at the U.S. Courthouse in Birmingham, Alabama. Upon due consideration, Intel's motion will be denied and Intergraph's motion will be granted.

**I.     Facts.**[1]

For a more complete recitation of the facts surrounding the relationship between the parties, see this court's Memorandum of Opinion and Preliminary Injunction entered on April 19, 1998. *Intergraph Corp. v. Intel Corp.*, 3 F. Supp. 2d 1255, 1258-73 (N.D. Ala. 1998). The facts directly relevant to the motions presently under consideration are for the most part

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

242

undisputed. In June of 1976, Intel Corporation and National Semiconductor Corporation (NSC), not a party to this litigation, entered into a cross-license agreement in which NSC granted to Intel "non-exclusive, nontransferable, royalty-free, world-wide licenses under NATIONAL PATENTS[2] and NATIONAL PATENT APPLICATIONS[3] to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS."[4] *Intel/NSC Cross-License*, Art. IV § 1. Under the agreement, Intel likewise granted to NSC licenses under its patents and patent applications. *Id.*, Art. III § 1. The term of the agreement, originally five years, has been extended through December 31, 2003 by amendment. *Id.*, Art. VI § 1. California law governs the cross-license agreement. *Id.*, Art. VII § 5.

On September 15, 1987, a Letter of Intent was executed by Intergraph for the acquisition of Fairchild Semiconductor Corporation's Advanced Processor Division ("the APD business"), including the applications for certain patents known as the "Clipper

---

[2] "National Patents" are defined as:

[A]ll classes or types of patents and utility models of all countries of the world, applications for which have a first effective filing date in any country prior to the date of expiration or termination of this Agreement, in respect of which, as of the EFFECTIVE DATE, or thereafter during the term of this Agreement, NATIONAL owns or controls or under which and to the extent to which and subject to the conditions under which NATIONAL may have, as of the EFFECTIVE DATE, or may thereafter during the term of this Agreement acquire, the right to grant licenses of the scope granted herein without the payment of royalties or other consideration to third persons, except for payments to third persons for inventions made by said persons while employed by NATIONAL.

*Intel/NSC Cross-License Agreement*, Art. I § 4.

[3] "National Patent Applications" are defined as "any applications for any classes or types of patents, utility models, and design patents, which, when issued, will become NATIONAL PATENTS." *Id.*, Art. I § 6.

[4] "Licensed Products" include "any product manufactured, used, or sold by either party covered by patents of the other party." *Id.*, Art. I § 7.

2

patents." That document was signed by the Chief Executive Officer of NSC. A Purchase Agreement was executed by NSC, Fairchild, and Intergraph on September 30, 1987, according to which NSC became obligated to cause Fairchild, which it was to acquire, to transfer the APD business and the Clipper patents to Intergraph. *NSC/Fairchild/Intergraph Purchase Agreement*, Sept. 30, 1987, at 1-2; *Affidavit of John Clark* ¶ 6. NSC also agreed that, in the event that NSC's acquisition of Fairchild was not complete as of the execution of the Purchase Agreement, NSC would "take all actions necessary to cause [the] Agreement to be executed by a duly authorized representative of Fairchild and to have all obligations to have been carried out by Fairchild executed immediately following [NSC's] acquisition of Fairchild." *NSC/Fairchild/Intergraph Purchase Agreement*, Sept. 30, 1987, at 37 n.*.

On October 8, 1987, NSC acquired a controlling interest in the stock of Fairchild, and Fairchild became a wholly owned subsidiary of NSC. *Affidavit of John Clark* ¶¶ 4, 7. Also on October 8, 1987, Fairchild transferred to Intergraph all assets and property relating to the APD business, including the Clipper applications. *Affidavit of James Meadlock* ¶ 3; *Affidavit of John Clark* ¶ 7. The Clipper patents were eventually issued to Intergraph from the United States Patent and Trademark Office several years later. *Affidavit of James Meadlock* ¶ 4.

### III. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party

3

asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the nonmovant has properly responded to a motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party

4

is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at

5

255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Analysis.

After careful consideration, the court is of the opinion that Intel's motion is due to be denied and that Intergraph is entitled to summary judgment on Intel's license defense. Two related lines of analysis both lead the court to this conclusion. First, the undisputed facts establish that NSC had no legal authority to grant a license, as the patents at issue belonged not to NSC but to a legally distinct corporation—Fairchild. Intel thus never received a license from any entity with the power to grant one. Second, the plain language of the license takes account of this cornerstone of corporate law, and excludes subsidiaries from the benefits of the cross-license unless and until they consent to the addition of their patents to the cross-license pool. In the absence of Fairchild's consent, the terms of the license did not cover Fairchild's Clipper patents.

The parties have expended a great deal of effort arguing the meaning of specific terms of the license agreement. For example, Intel argues that the term "control," as used in the license agreement, extends to the Clipper patents owned by Fairchild when it was acquired by NSC because NSC had the ability to direct Fairchild to assign a license to Intel. *See Intel's Initial Submission* at 8-9. Intergraph, on the other hand, contends that the definition of "National patent applications" provided in the agreement specifically excludes patents which are ultimately issued to parties other than NSC. *See Intergraph's Responsive Submission* at 14-17. Although neither argument is particularly persuasive, the court need not resolve these disputes because it must first address the threshold issue of NSC's power

6

to grant any license to the Clipper patents—an issue which neither party has addressed in detail.

The fundamental flaw in Intel's license defense is that the alleged license would have originated from NSC, while the Clipper patents quite clearly belonged not to NSC but to Fairchild, a separate corporation. Thus, however clear the terms of the license, no rights to the Clipper patents could have passed to Intel unless NSC somehow acquired the right to grant a license in the patents of Fairchild. As NSC received no direct rights in the Clipper technology during the course of the October 8, 1987 transactions or any other time, *see Affidavit of Donald Brooks* ¶ 7, any power to grant a license could have arisen only out of NSC's ownership of Fairchild's stock.

A basic tenet of the law of corporations, however, is that a corporation is a separate legal entity which can possess its own property and hold legal sway over that property. *See* 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 11 (rev. ed. 1999). It is axiomatic that owning stock in a corporation is not the equivalent of owning that corporation's property, and a shareholder generally cannot dispose of a corporation's property without duly authorized action by the corporate management. *See* 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 31 (rev. ed. 1999); 18A Am. Jur. 2d Corporations § 750 (1985); *Watson v. Bonfils,* 116 F. 157 (8th Cir. 1902); *Sanborn-Cutting Co. v. Paine,* 244 F. 672, 679 (9th Cir. 1917); *Capital Parks, Inc. v. Southeastern Advertising and Sales System, Inc.,* 30 F.3d 627, 629 (5th Cir. 1994); *In re Pearl-Wick Corporation,* 26 B.R. 604, 607 (S.D.N.Y. 1982); *Hinton v. Carney,* 250 S.W.2d 364, 365 (Tenn. 1952) (citing *Parker v. Bethel Hotel Co.,* 34 S.W. 209 (Tenn. 1896)); *Borough of Ambridge v. Philadelphia Co.,*

7

129 A. 67, 69 (Pa. 1925); *Holsclaw v. Kenilworth Insurance Co.,* 644 S.W.2d 353, 355 (Kent. Ct. App. 1982); *SFN Shareholders Grantor Trust v. Indiana Dep't of State Revenue,* 603 N.E.2d 194, 197-99 (Ind. Tax Ct. 1992). As a result, NSC was not entitled, merely because of its status as a shareholder, to grant rights in the Clipper patents to anyone. That right remained solely with Fairchild.

The court recognizes that there are some situations in which the usual rule might not apply. For reasons either practical or equitable, courts have at times disregarded the formal requirement of corporate action and allowed the actions of a shareholder to stand as those of the corporation. *See, e.g., Wagner v. Wagner,* 353 A.2d 819, 821 (Penn. 1976); *Davis Elkins and Bristol Natural Gas Corp. v. Industrial Gas Corp.,* 28 S.E.2d 21, 25 (Va. 1943); *Amoss v. Bennion,* 420 P.2d 47, 49 (Utah 1966); *Wall v. Colvard, Inc.,* 149 S.E.2d 559, 564 (N.C. 1966); *Newman v. Toy,* 926 S.W.2d 629, 631 (Tex. Ct. App. 1996); *Epperly v. E. & P. Brake Bonding, Inc.,* 348 N.E.2d 75, 82 (Ind. Ct. App. 1976). In the present case, however, the court is not called upon to decide whether such an exception might apply if, for example, Intel and Fairchild were engaged in a dispute over the patents at issue. The court is sufficiently satisfied that under the circumstances present in this case, Intergraph, a third party, is entitled to rely upon the general rule. What the court has before it, in essence, is a dispute between two claimants to a property right. One, Intergraph, claims it received its right in the property from Fairchild. The other, Intel, asserts it obtained a right in the same property from Fairchild's parent corporation, NSC. Under these circumstances, it is the court's view that Intergraph—the claimant who obtained the property from its legal owner—must prevail.

Nor does the court see any reason to call upon its equitable powers to alter this result. The record contains no evidence of bad faith or other misfeasance on the part of Intergraph, NSC, or Fairchild. It does not appear that Intel relied upon any assertion by these companies, or even claimed that a license had been granted until this litigation began. Whether or not technical mistakes were made in the handling of the October 8, 1987 transactions,[5] nothing suggests that these mistakes were anything but innocent and Intergraph cannot equitably be held responsible for them.[6] Therefore, the court sees no manifest injustice in applying the result compelled by application of general corporate law.

In the alternative, the court concludes that the license agreement allegedly relied upon does not, by its terms, cover the Clipper patent applications. The cross-licensing agreement purports to grant a license in any "National patents," which are defined as patents that National owns, controls, or has the right to grant licenses to without the payment of royalties to third persons. See *Intel/NSC Cross-License Agreement*, Art. I § 4. However, the parties clarified this language in the agreement by specifically providing for the treatment of subsidiaries. Article III, Section 2 of the cross-license agreement states that:

---

[5] See, for example, the Power of Attorney executed by the President and CEO of NSC on behalf of Fairchild on October 8, 1987. Although the court is unclear what effect, if any, this document might have on Intergraph's title to the APD business and Clipper patents, it does not warrant the application of equitable relief on behalf of Intel vis-à-vis Intergraph under the circumstances of this case.

[6] The court further notes that Intergraph did not disregard the corporate existence of Fairchild merely by dealing with NSC regarding the APD division. This was a perfectly legitimate tactic, premised on the undisputed understanding that a parent company, as a practical matter, can control the actions of its subsidiaries. As long as the corporate formalities are observed, however, this does not mean that the subsidiary is not a separate and distinct legal entity. As the documents reveal, the parties recognized that Fairchild must ultimately sign off on any transfer of assets. See *NSC/Fairchild/Intergraph Purchase Agreement*, Sept. 30, 1987. Fairchild did not approve any license to Intel, so none was issued. If Fairchild did not properly approve the APD sale to Intergraph, the effect of that failure is an entirely separate question.

9

> INTEL agrees that NATIONAL shall have the right to extend the licenses granted pursuant to Section 1 hereof only to those of its SUBSIDIARIES[7] which will agree to include their patents, utility models and design patents and applications therefor covering LICENSED PRODUCTS in NATIONAL PATENTS and NATIONAL PATENT APPLICATIONS. Upon written request by INTEL, NATIONAL will give INTEL written notice to identify any SUBSIDIARY to which such a license has been extended.

*Intel/NSC Cross-License Agreement*, Art. III § 2. In the court's view, this language was inserted to account for the realities of corporate life already discussed. Because a parent cannot grant a license in the patents of its subsidiaries, the parties to the cross-license could not simply extend the license to cover the patents of their subsidiaries. Active consent by the subsidiaries was required. To accomplish this, the parties agreed to exclude their subsidiaries from the benefits of the cross-license unless and until they were willing to add their patents to the cross-license pool. This clause makes perfect practical sense, and indicates in relatively clear language that patents owned by subsidiaries do not fall within the definition of National Patents. Intel's reading would render this language a nullity, an outcome to be avoided when construing such a document. *Intel Corporation v. USITC*, 946 F.2d 821, 826 (Fed Cir. 1991).

For the foregoing reasons, the court concludes that no license passed to Intel, and Intergraph is entitled to summary judgment on Intel's license defense.

---

[7] "Subsidiary" is defined as:

> [A]ny corporation, company or other entity at least fifty percent (50%) of whose outstanding shares of stock entitled to vote for the election of directors (other than any shares of stock whose voting rights are subject to restriction) is owned or controlled by either party hereto, directly or indirectly, now or hereafter.

*Intel/NSC Cross-License Agreement*, Art. I § 1.

10

Done, this _____ of June, 1999.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE